**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JUSTIN LAYSHOCK, a minor, by and    )
through his parents, DONALD          )
LAYSHOCK and CHERYL LAYSHOCK,        )
individually and on behalf of their son, )
                                     )
        **Plaintiffs,**              )
                                     )
    **v.**                           )
                                     )    **2:06-cv-116**
HERMITAGE SCHOOL DISTRICT,           )
KAREN IONTA, District Superintendent, )
ERIC W. TROSCH, principal of Hickory )
High School, CHRIS GILL, Co-Principal of )
Hickory High School, all in their official )
and individual capacities,           )
                                     )
        **Defendants.**              )

## MEMORANDUM OPINION AND ORDER

Before the Court for consideration and disposition are cross-motions for summary

judgment, PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (*Document No. 44)* and

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT *(Document No. 49)*, with

memoranda in support *(Document Nos. 45, 50).*  Each side has also filed a brief in opposition to

the other side's motion *(Document Nos. 54, 56)*, and statements of undisputed fact.  At the

Court's invitation, the parties have also filed briefs on the issue of qualified immunity.

*(Document Nos. 60, 62)*.  Both parties have also filed memoranda on Supplemental Authority

*(Document Nos. 64, 67)*.  The motions are ripe for resolution.


## Background

At the time of the events at issue, Plaintiff Justin Layshock ("Justin") was a seventeen-

year old senior at Hickory High School in the Hermitage School District.  While Justin was

generally an academic success, his out-of-school conduct led to in-school punishment by

Defendants.  On or about December 10, 2005,[1] Justin created that which he characterized as a

---

[1]Plaintiffs state that the profile was created on or about December 14, 2005, but neither
side disputed the other's date.

parody profile (the "profile") of defendant Eric Trosch ("Trosch"), the Principal of Hickory High School.  The profile was created on a website called "MySpace.com" (www.myspace.com) ("MySpace"), which is a very popular Internet site where users can share photos, journals, personal interests and the like with other users of the Internet.  As early as October 2005, the school district attempted to block access to MySpace from the school computers.

MySpace has a template for user profiles, which allows website users to fill in background information and include answers to specific questions.  Justin created his profile of Trosch by using his grandmother's computer, at her home, during non-school hours.  No school resources were used to create the profile but for a photograph of Trosch that Justin copied from the school's website by performing a simple "copy and paste" operation with his mouse.  Justin's answers to the questions, which appeared to be by and about Trosch, centered on the theme of "big."  The answers ranged from nonsensical answers to silly questions on the one hand, to crude juvenile language on the other.  For example, in response to the question "in the past month have you smoked?," the profile says "big blunt."  In response to a question regarding alcohol use, the profile says "big keg behind my desk."  In response to the question, "ever been beaten up?," the profile says "big fag."  The answer to the question "in the past month have you gone on a date?" is "big hard-on."  The profile also refers to Trosch as a "big steroid freak" and "big whore."  The profile also reflected that Trosch was "too drunk to remember" the date of his birthday.  *Id*. Justin sent the profile to other students in the district by adding "friends" to the profile on the MySpace website, and eventually word of the profile soon reached most, if not all, of the student body of Hickory High School.

During the mid-December 2005 time period, there were three other unflattering profiles of Principal Trosch on MySpace, which contained more vulgar and offensive statements. *Compare* Plaintiffs' Exhibits 3-6.  Trosch first learned of the existence of a profile, which was not the one created by Justin,  on Sunday, December 11, 2005 from his daughter, an 11th grade student in the district.  On Monday, December 12, 2005, Trosch told co-principal Chris Gill and

Superintendent Karen Ionta about the profile and asked Technology Director Frank Gingras to disable it.  Gingras also blocked access to www.myspace.com.  However, this action was ineffective because the MySpace site has other web addresses and students found other ways to access the profiles.  Trosch became aware of the existence of two other profiles, including the one created by Justin, on the evening of Thursday, December 15, 2005.

Justin engaged in some limited conduct related to the profile while in school.  He accessed his profile from a computer in the Spanish classroom on December 15.  Justin showed the profile to other classmates, although he did not claim authorship of the profile at that time.[2] One of the students explained that the teacher was unaware of their activity.  Another student explained that after viewing the profile, the students logged off of MySpace.com.  Justin attempted to access his profile from school again on the 16th, assertedly to delete it.  School administrators were unaware of Justin's in-school attempts to access MySpace until their investigation during the following week.

There is also evidence in the record that the profile created by Justin had been viewed in-school by other students beginning on Thursday, December 15, 2005.  Teacher Craig Antush observed students congregating and giggling in his computer lab class, glimpsed Justin's profile on the computer, and told the students to shut it down.  Antush Deposition at 11.  Antush did not report this incident to school administrators.  Antush Deposition at 12-13, 16.  Co-principal Chris Gill did not personally witness any disruptive behavior in the school but he testified that approximately five teachers called him on December 15 to report that students wanted to discuss the profiles during class.  In addition, more than five students were referred by teachers to speak

---

[2]There are some minor discrepancies in the record as to whether Justin was actually operating the computer or was standing behind the other students, but the Court finds these to be immaterial.  *Compare* Justin Layshock Deposition at 36-38 *with* Statements of A. Rader and T. Watts.

to Gill about the profiles so that he could investigate their authorship.[3]

On Friday morning, December 16, 2005, Trosch convened a teachers meeting. Teacher Susan MacElroy had not been aware of the MySpace profiles controversy prior to this meeting. During the meeting, Trosch became very emotional and could not continue. Gill then took over, explained to the staff that there was a disruption, and asked the teachers not to discuss it with students during class. Instead, teachers were directed to send all students who might have information about the profiles to the office. Gill spent most of the morning on the 16th talking to approximately twenty students who were referred to the office because "they had made conversation, made a joke, made a disruption in class, that the teacher had to redirect." Gill Deposition at 84. Gill interviewed the students in an effort to find out who had created the profiles and cautioned the students not to discuss the topic in class. Gill also talked to ten teachers.

The school administrators sought to completely block students from accessing MySpace. However, the technology coordinator, Frank Gingras, was on vacation on the 16th and not at the school. Gill and Trosch spoke to Gingras at his home about shutting down the computers but learned that it was not feasible. Trosch and Ionta then contacted MySpace directly and succeeded in having the profiles disabled. In addition, administrators sent an email on Friday afternoon at 1:34 P.M. (Plaintiffs' Exhibit 7), stating:

> Please do not allow any students to use your personal desktop computer or any computer in your classroom. If they need to use it the computer [sic] for Cognitive Tutoring or research, they can use it with supervision in the labs or library.[4]

Computer use was limited from December 16 through Wednesday, December 21, which was the

---

[3]The record reflects that none of the teachers identified as witnesses recalls talking to Gill until Friday, December 16. However, this discrepancy is not material.

[4]Gingras testified at the TRO Hearing that "All student computers were locked down." Transcript at 174. However, Gingras was not at school on the 16th and his testimony is inconsistent with the guidelines set forth in the email and the deposition testimony of teachers.

last day of school before the Christmas recess.  During these four days, students were permitted
to use computers for regularly scheduled classes in the computer lab.  Computer programming
classes were cancelled.  Two or three teachers asked if computers could be used for certain
classroom purposes and Trosch informed them that computer use was permissible if under
teacher supervision.  Plaintiffs' Statement of Material Facts ¶ 49.  Several teachers made
revisions to their lesson plans, for example, printing out web pages rather than permitting student
access, converting an in-class assignment requiring internet access to a home assignment and
changing an internet research lesson into a class discussion.  Teacher Allissa Sgro testified about
a "buzz" of comments, but these were specifically directed at Trosch's son, who was a student in
the class, and the comments did not prevent Ms. Sgro from teaching.  Sgro Deposition at 17-19.

On Monday, December 19, Frank Gingras, working with a specialist from the
intermediate unit, disabled access to the entire MySpace.com website.  As of December 19,
students could no longer access any MySpace page or Trosch profile from school computers and
there were no further incidents.  Plaintiffs' Statement of Material Facts ¶ 52.  Gingras spent
approximately 25% of his time that week on issues related to the profiles.  Gingras testified at the
TRO Hearing that his efforts regarding MySpace took time away from making an electronic
grade book website operational, but did not otherwise prevent him from being able to complete
his tasks.  Transcript at 173-174.

The School District admits that it "cannot directly attribute which profile caused the
disruption."  Defendants' Response to Plaintiffs' Statement of Material Facts ¶ 66.   Some of the
in-school disruption was caused by other profiles.  For example, in an email dated January 29,
2006, Antush explained that he became firm with students because they were huddling around
one or two computers trying to see a profile of Trosch, which interfered with the class.  There
was a moment when he considered shutting down power to the computer lab, but that did not
become necessary.  This incident involved the more vulgar profile.  Antush Deposition at 18.  As
another example, teacher Tricia Dye described a one to two minute conversation between

students when a student came into class late and bragged about being questioned by police about a profile that was created by someone other than Justin.  Dye Deposition at 15-17.  Although the school's investigation shows how many students accessed MySpace.com during the period, the school could not determine how many students accessed any of the Trosch profiles, or the specific profile Justin created.  Some of the student discussion related not to the profiles themselves, but to the administration's investigation and punishment of Justin.  Plaintiffs' Statement of Facts ¶ 71.

On December 21, 2005, Justin and his mother, Plaintiff Cheryl Layshock, were summoned to a meeting with Superintendent Ionta and Co-Principal Gill.  At the meeting, Justin admitted to having created one MySpace profile of Trosch.  No disciplinary action was taken against Justin at that time.  By letter dated January 3, 2006, Justin and his parents were advised that he was suspended and that an informal hearing would be held at the school on January 6, 2006 to consider disciplinary action.  The alleged violations of the Hermitage School District's disciplinary codes were described as follows: "Disruption of the normal school process: Disrespect:  Harassment of a school administrator via computer/internet with remarks that have demeaning implications:  Gross misbehavior:  Obscene, vulgar and profane language:  Computer Policy violation; (use of school pictures without authorization).  Verified Complaint, exh. 1.  At the January 6, 2006 hearing, Justin received a ten-day out-of-school suspension.  Additional discipline imposed on Justin included 1) placing him in the high school Alternative Curriculum Education program for the remainder of the 2005-2006 school year; 2) banning him from attendance or participation in any events sponsored by or participated in by the Hermitage School District, including Academic Games and tutoring in which Justin had regularly participated, and 3) prohibiting him from participating in the June 2, 2006 high school graduation ceremony.

On January 27, 2006 Plaintiff filed a three-count Verified Complaint pursuant to 42 U.S.C. § 1983, as well as a Motion for Temporary Restraining Order and/or Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65.  Count I alleges that "Defendant's

6

(*sic*) punishment of Justin Layshock for his parody website of Head Principal Trosch violates his rights under the First Amendment to the United States Constitution ..."  Verified Complaint at ¶ 57.  Count II alleges that "Defendants' policies and rules are unconstitutionally vague and/or overbroad, both on their face and as applied to Justin Layshock, and thus violate the First Amendment to the United States Constitution ...  *Id*. at ¶ 58.  Count III alleges that "Defendants' punishment of Justin Layshock for constitutionally protected speech in his own home interfered with, and continues to interfere with, Mr. and Mrs. Layshock's rights as parents to determine how best to raise, nurture, discipline and educate their children in violation of their rights under the Fourteenth Amendment to the U.S. Constitution ..."  *Id*. at ¶ 59.

After a hearing, the Court denied Plaintiffs' motion for a temporary restraining order (TRO).  At the TRO hearing, Defendants presented evidence that Justin's profile of Trosch caused actual disruption of the day-to-day operations of Hickory High School from December 12 through December 21, 2005.  As a result, the Court concluded that "[u]nder these circumstances Plaintiffs' actions appear to have substantially disrupted school operations and interfered with the rights of others, which, along with his apparent violations of school rules, would provide a sufficient legal basis for Defendants' actions." Memorandum Opinion dated January 31, 2006.  The more fully developed summary judgment record now before the Court demonstrates that the disruption of school operations was not substantial.

At a status conference with the Court on February 8, 2006, the parties were encouraged to discuss amicable resolution of some or all of the disputed issues framed in the litigation.  After the conference, the disciplinary measures imposed upon Justin were eased somewhat.  He was thereafter phased out of the Alternative Curriculum Education program and back into regular class attendance, permitted to participate in Academic Games and attend the graduation ceremony.  Unfortunately, complete resolution of all disputed issues was not achievable.

Standard of Review

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).  The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion.  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249).  Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

Discussion

This is an important and difficult case, in which the Court must balance the freedom of expression of a student with the right and responsibility of a public school to maintain an environment conducive to learning.   This case began with purely out-of-school conduct which subsequently carried over into the school setting.  Several recent cases in this District have concluded that a school district may not punish a student for out-of-school speech.  *See Killion v. Franklin Regional School Dist.*, 136 F. Supp. 2d 446 (W.D. Pa. 2001) (school could not punish student for list disparaging athletic director);  *Flaherty v. Keystone Oaks School Dist.*, 247 F. Supp. 2d 698 (W.D. Pa. 2003) (school could not punish student for "trash talk" about volleyball game);  *Latour v. Riverside Beaver School Dist.*, No. 05-1076, 2005 WL 2106562 (W.D. Pa. Aug. 24, 2005) (enjoining school from punishing student for rap song lyrics).  An equally well-

8

reasoned opinion from the Pennsylvania Supreme Court, *J.S. v. Bethlehem Area School District*, 807 A.2d 847 (Pa. 2002) (involving a student-created website about school staff), upheld the school's disciplinary authority.

On June 25, 2007, the United States Supreme Court issued its decision in the case of *Morse v. Frederick*, 2007 WL 1804317 (U.S. June 25, 2007), which involved a First Amendment challenge by a student who was punished for unfurling a banner which proclaimed: "Bong HiTS 4 Jesus" during a time when students were released from school to go across the street to view the Olympic torch relay. The five separate opinions in *Morse* illustrate the complexity and diversity of approaches to this evolving area of law.[5] Unfortunately, because the Justices unanimously agreed that *Morse* involved school-related speech, *Morse* is not controlling of the instant matter. Indeed, *Morse* acknowledged that "[t]here is some uncertainty at the outer boundaries as to when courts should apply school-speech precedents." *Id.* at *5.

A.      Count I:  Justin Layshock's First Amendment Claim

1.      General First Amendment Principles

The parties have identified the basic legal tests that govern student expression and this Court's Memorandum Opinion of January 31, 2006, outlined the applicable legal framework. The difficulty is in articulating the appropriate constitutional boundaries as to the breadth of public school disciplinary authority in this particular factual scenario. The United States Court of Appeals for the Third Circuit provided the following overview of the First Amendment rights of students in the school setting in *Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d 243,

---

[5]Chief Justice Roberts' majority opinion held that school officials did not violate the student's First Amendment rights by confiscating his pro-drug banner. Justice Thomas opined in his concurrence that the First Amendment does not protect student speech in public schools. Justice Alito emphasized his view that the Court's decision in *Morse* was at "the far reaches of what the First Amendment permits." Justice Breyer would have decided the case solely on qualified immunity grounds. Justice Stevens' dissent concluded that the student's conduct was protected by the First Amendment, although he agreed that some viewpoint discrimination may be permissible in schools and the principal should not be liable for pulling down the banner.

252 (3d Cir. 2002) (enjoining enforcement of a school anti-harassment policy):

> The public school setting demands a special approach to First Amendment disputes. Most students are minors, and school administrators must have authority to provide and facilitate education and to maintain order. The Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). On the other hand, "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. Thus, students retain the protections of the First Amendment, but the shape of these rights in the public school setting may not always mirror the contours of constitutional protections afforded in other contexts.

*Sypniewski*, 307 F.3d at 252-53 (some citations omitted). *Morse* reaffirmed these principles. 2007 WL 1804317 at * 3, 18.

The *Killion* court summarized the relationship between *Tinker* and the Supreme Court's other major student-speech cases:

> These decisions reveal that, under [*Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986)], a school may categorically prohibit lewd, vulgar or profane language on school property. Under *Hazelwood* [*School District v. Kuhlmeier*, 484 U.S. 260 (1988)], a school may regulate schools-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern. "Speech falling outside of these categories is subject to *Tinker's* general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir.2001) (citations omitted).

*Killion*, 136 F. Supp. 2d. at 453. The *Killion* court also observed that "courts considering speech that occurs off school grounds have concluded (relying on Supreme Court decisions) that school officials' authority over off-campus expression is much more limited than expression on school grounds," but have declined to apply a heightened standard of review because "[t]he overwhelming weight of authority has analyzed student speech (whether on or off campus) in accordance with *Tinker*." *Id.* at 454-55. *See also Porter v. Ascension Parish School Bd.*, 393 F.3d 608, 615 (5th Cir. 2004) (listing cases, but holding that the student artwork at issue was protected by the First Amendment because it was not created on-campus or directed at campus).

*Morse* has not changed this basic framework. The majority opinion distilled two fundamental principles from *Fraser*. First, the constitutional rights of public school students are

not co-extensive with those of adults in other settings.  2007 WL 1804317 at *8.  Thus, student speech cases must be resolved "in light of the special characteristics of the school environment."  *Id.*  Second, although the mode of analysis employed in *Fraser* is "unclear," it certainly did not employ the "substantial disruption" test set forth in *Tinker*.  However, the *Morse* Court refused to read *Fraser* expansively for the proposition that speech may be proscribed simply because it is "offensive."  *Id.* at *10.

An important part of the *Tinker* test is the recognition that courts must defer to school administrators' determinations regarding whether student behavior within their supervision merits punishment. 393 U.S. at 507; *Accord J.S. v. Bethlehem*, 807 A.2d at 868 n. 13 (noting that "great deference" should be given by courts to school disciplinary decisions); *Morse* (Thomas, J., concurring) (arguing that school punishment should not be subject to judicial oversight).   It is clear that school administrators need not wait until a "substantial disruption" has already occurred prior to taking action.  Rather, school administrators may preempt problems if they have a "specific and significant fear of disruption."  *Saxe*, 240 F.3d at 211.  *See also Boucher v. School Board of School District of Greenfield,* 134 F.3d 821, 827-28 (7th Cir. 1998) (rejecting argument that school must show "actual harm" in cases where the publication had occurred and upholding expulsion of student who published article about hacking into school computer).

On the other hand, a mere desire to avoid discomfort or unpleasantness will not suffice.  In *Saxe*, now-Justice Alito explained that a bedrock principle underlying the First Amendment is that expression may not be prohibited simply because society finds the idea offensive or disagreeable.  240 F.3d at 209.  The *Saxe* Court went on to explain that government may not prohibit student speech based solely on the emotive impact that its offensive content may have on a listener.  *Id.*  Rather, a school must point to a "well-founded expectation of disruption," such as past incidents arising out of similar speech.  *Id.* at 212.  In *Klein v. Smith*, 635 F. Supp. 1440 (D. Me. 1986), the Court rejected the argument that a student's disrespect to a teacher off-campus would weaken the resolve of the teaching staff to enforce school discipline, such that the

student's conduct created a substantial disruption.  The Court aptly commented that educators' professional integrity, resolve and character "are not going to dissolve, willy nilly, in the face of the digital posturing of this splenetic, bad-mannered little boy."  *Id.* at 1442.

2.       The Boundaries of Hermitage School District's Authority

The threshold, and most difficult, inquiry is whether the school administration was authorized to punish Justin for creating the profile.  The mere fact that the internet may be accessed at school does not authorize school officials to become censors of the world-wide web. Public schools are vital institutions, but their reach is not unlimited.  Schools have an undoubted right to control conduct within the scope of their activities, but they must share the supervision of children with other, equally vital, institutions such as families, churches, community organizations and the judicial system.

The purpose of this boundary on school authority was explained in *Thomas v. Board of Education, Granville Central School District*, 607 F.2d 1043, 1052 (2d Cir. 1979):

> When school officials are authorized only to punish speech on school property, the student is free to speak his mind when the school day ends. In this manner, the community is not deprived of the salutary effects of expression, and educational authorities are free to establish an academic environment in which the teaching and learning process can proceed free of disruption. Indeed, our willingness to grant school officials substantial autonomy within their academic domain rests in part on the confinement of that power within the metes and bounds of the school itself.

*Thomas* involved students suspended for printing a sexually explicit magazine.  Some of the initial preparation and composition of articles for publication occurred after school hours in a classroom and copies were stored in a classroom closet. The publication surfaced when a teacher confiscated a copy from another student on campus.  The Second Circuit found that the magazine was deliberately designed to take place outside of school and that these on-campus contacts were "de minimis."  *Id.* at 1050.  The Court then explained that "because school officials ventured out of the school yard and into the general community where the freedom accorded expression is at

its zenith, their actions must be evaluated by the principles that bind government officials in the public arena." *Id.*  The Court concluded that although it condoned "an added increment of chilling effect when school officials punish strictly limited categories of speech within the school, we reject the imposition of such sanctions for off-campus expression." *Id.* at 1051. Thus, the student expression was protected by the First Amendment even though administrators could reasonably foresee that the magazine would be distributed in school. *Id.* at 1053.  The *Thomas* Court noted that it was not addressing the scenario in which a group of students incited a substantial disruption within the school from a remote location. *Id.* at 1052 n. 17.

It is clear that the test for school authority is not geographical.  The reach of school administrators is not strictly limited to the school's physical property.  For example, schools have an undoubted ability to govern student conduct at school-sponsored field trips, sporting events, academic competitions and during transit to and from such activities.  On the other hand, the mere presence of a student on school property does not trigger the school's authority.  In *D.O.F. v. Lewisburg Area School Dist. Bd. of School Directors*, 868 A.2d 28 (Pa. Commw. 2004), the school expelled a student who was found smoking marijuana on a school playground at 10:30 p.m., approximately 90 minutes after a school band concert.  The Court noted that school boards have broad discretion to determine school disciplinary policy, and that courts should not act as a "super school board" in substituting their judgment for that of the school district.  However, the Court noted that school districts do not have inherent power to implement policies in the name of school safety.  Rather, "a school district's rulemaking authority is limited to that which is expressly or by necessary implication granted by the General Assembly." *Id.* at 33.  When schools act outside their authority, courts can intervene. *Id.*  The Court then explained that an express limitation on schools' authority is that they "can discipline only those students who are enrolled in the district and under the district's supervision at the time of the incident." *Id.* at 34-35 (citation omitted).  Stated somewhat differently, the Court  recognized that it is well within a school board's discretion to punish inappropriate behavior to maintain the discipline and welfare

13

of students, but only where those students are "in the district's charge at school functions." *Id.* at 36. Thus, the Court adopted a "functional" test. Applying this test, the Court concluded that the student could not be punished by the school because there was no connection between the student's drug use at night on the school playground and any school function.

Pennsylvania's Public School Code defines a "temporal" test of school authority in 24 P.S. § 5-510, which states:

> The board of school directors in any school district may adopt and enforce such reasonable rules and regulations as it may deem necessary and proper ... regarding the conduct and deportment of all pupils attending the public schools in the district, during such time as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school.

Similarly, the School Code defines a time period in which school authorities act *in loco parentis* over their students, as set forth in 24 P.S. § 13-1317:

> Every teacher, vice principal and principal in the public schools shall have the right to exercise the same authority as to conduct and behavior over the pupils attending his school, during the time they are in attendance, including the time required in going to and from their homes, as the parents, guardians or persons in parental relation to such pupils may exercise over them.

In *Tinker*, the Supreme Court articulated an operational test, explaining that student First Amendment rights do not embrace merely the classroom hours, but also extend to the cafeteria, the playing fields and on-campus conduct during authorized hours. 393 U.S. at 512-13. However, the Court then added: "But conduct by the student, in class or out of it, which for any reason – whether it stems from time, place, or type of behavior – materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513. The Supreme Court in *Morse* recited a litany of contextual factors in determining that the speech was school-related: it occurred during normal school hours, at a sanctioned school event, in the presence of teachers and administrators charged with supervising students, the school band and cheerleaders performed, and the message was directed at most of the student body. 2007 WL 1804317 at *5.

Regardless of whether the source of the school's authority is based on timing, function,

context or interference with its operations, it is incumbent upon the school to establish that it had the authority to punish the student.  In most cases, this will be a simple and straight-forward exercise.  However, in cases involving off-campus speech, such as this one, the school must demonstrate an appropriate nexus.  As the case law demonstrates, on this threshold "jurisdictional" question the Court will not defer to the conclusions of school administrators.

3.    Application to this Record

Defendants seek to justify their punishment of Justin under either the *Tinker* or *Fraser* tests.  In upholding the school's ability to prohibit a lewd, sexually inappropriate speech, the *Fraser* Court noted that schools may punish student speech that "would undermine the school's basic educational mission."  478 U.S. at 685.  However, Justice Alito's concurrence in *Morse* clarifies that *Morse* does not permit school officials unfettered latitude to censor student speech under the rubric of "interference with the educational mission" because that term can be easily manipulated.  This Court has no difficulty concluding, and will assume arguendo, that Justin's profile is lewd, profane and sexually inappropriate.  Nevertheless, *Fraser* does not give the school district authority to punish him for creating it.  In effect, the rule in *Fraser* may be viewed as a subset of the more generalized principle in *Tinker*, i.e., that lewd, sexually provocative student speech may be banned without the need to prove that it would cause a substantial disruption to the school learning environment.   However, because *Fraser* involved speech expressed during an in-school assembly, it does not expand the authority of schools to punish lewd and profane off-campus speech.  There is no evidence that Justin engaged in any lewd or profane speech while in school.  In sum, the *Fraser* test does not justify the Defendants' disciplinary actions.

As to the *Tinker* test, the Court concludes that, even construing the evidence in a light most favorable to Defendants, they have not established a sufficient nexus between Justin's speech and a substantial disruption of the school environment.  There are several gaps in the

15

causation link between Justin's off-campus conduct and any material and substantial disruption of operations in the school.  Most notably, the School District is unable to connect the alleged disruption to Justin's conduct insofar as there were three other profiles of Trosch that were available on myspace.com during the same timeframe.  Moreover, the School has not demonstrated that the "buzz" or discussions were caused by Justin's profile as opposed to the reaction of administrators.  *See Latour*, 2005 WL 2106562 at *2 (distinguishing between disruption caused by student's lyrics and that caused by student reaction to administrators' decision to punish student).  Indeed, Plaintiffs point to instances in the record in which students objected to the investigation, rather than the profile.

In addition, a reasonable jury could not conclude that the "substantial disruption" standard could be met on this record.[6]  The actual disruption was rather minimal – no classes were cancelled, no widespread disorder occurred, there was no violence or student disciplinary action.  A primary piece of evidence on which Defendants rely is that one computer teacher threatened to shut down the system, but that teacher testified that he was able to restore order to his classroom and that the incident was triggered by a profile other than Justin's.  The profiles were accessible for less than one week before being disabled immediately prior to the Christmas vacation.  There were some student comments about the profiles.  However, in *Tinker* the Supreme Court held that the far more boisterous and hostile environment sparked by the children wearing anti-Vietnam war armbands, *see* 393 U.S. at 517-18 (Black, J., dissenting) (describing factual record in *Tinker*), did not give school officials a reasonable fear of disturbance sufficient to overcome their right to freedom of expression.

The Court's analysis in *Killion* is also instructive.  In *Killion*, 136 F. Supp.2d at 455, this Court addressed a similar situation involving a Top 10 list about the athletic director that a student created on his home computer.  Former Chief Judge Ziegler concluded that there was no

---

[6]The Court need not reach Plaintiffs' argument that the post-hoc teacher statements should not be admissible. *See In re Bressman*, 327 F.3d 229, 237-38 (3d Cir. 2003).

evidence that teachers were incapable of teaching or controlling their classes because of the list and that it had been circulating within the school for several days before adminstrators became aware of its existence and took action.   As in *Killian*, the record in this case reflects that the first profile was discovered on December 11, 2005 and circulated for several days before administrators took any action.  Although the list in *Killian* was rude and demeaning, and its intended audience "was undoubtedly connected" to the school, the lack of substantial disruption led the Court to conclude that the suspension of the student was improper.  The Court rejected the school's contention that the standard was met because the athletic director and librarian (the victim of a similar list) were upset, and that the list impaired administrators' ability to discipline students.

 The only "in-school" conduct in which Justin engaged was showing the profile to other students in the Spanish classroom.  While this conduct, in theory, might support the punishment issued by the administration, there is no evidence from which a reasonable jury could conclude that this incident caused a material and substantial disruption of school operations.  Indeed, the statements of the other students indicate that the teacher was not even aware of what was going on, and that after viewing the profile the students promptly logged off of myspace.com.  In *Thomas*, the Second Circuit deemed more substantial on-campus activity to be "de minimis."

In addition, the actual charges made by the School District were directed only at Justin's off-campus conduct.  On this record, there is no evidence that the school administrators even knew that Justin had accessed the profile while in school prior to the disciplinary proceedings.  In *Thomas*, 607 F.2d at 1050 n. 12, the Second Circuit rejected the school's effort to discipline the students for insubordination due to their on-campus activities because the suspension letter sent to parents clearly indicated that the discipline was premised on the publication of the offensive, indecent magazine.  *Accord D.O.F. v. Lewisburg*, 868 A.2d at 37 (school's allegations based solely on drug use rather than possible on-campus purchase of drugs).

Nor can the "substantial disruption" standard be met through a fear of future disturbances.

The school was shut down for the holiday and Justin was suspended immediately upon the resumption of classes.  Moreover, all the MySpace related sites had been successfully blocked. Indeed, Defendants have never attempted to justify their action based on a fear of  future disruption.  In sum, the School District has failed to demonstrate a sufficient causal nexus between Justin's conduct and any substantial disruption of school operations.  Accordingly, the School's right to maintain an environment conducive to learning does not trump Justin's First Amendment right to freedom of expression based on the evidentiary record in this case.

Count I of the Complaint asserts a First Amendment claim on behalf of Justin under Section 1983.  Plaintiffs ask the Court to declare that the disciplinary action imposed upon Justin for posting the profile of Mr. Trosch on the internet violated his rights under the First Amendment.  In addition, Plaintiffs seek compensatory damages and counsel fees.  In this case, it is undisputed that Trosch was not involved with the discipline of Justin.  *See* Defendants' Statement of Material Facts ¶ 55.  Thus, Trosch is entitled to summary judgment on all counts. Further, as explained below, Ionta and Gill are entitled to summary judgment on the basis of qualified immunity.  In *Irene B. v. Philadelphia Academy Charter School*, 2003 WL 24052009 (E.D. Pa. 2003), the Court sua sponte dismissed claims against a school administrator in his official capacity as duplicative of claims against the school.  *Id.* at *9 (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1992)).  Thus, Justin will be granted summary judgment as to liability on Count I against the Hermitage School District only and the school district's cross-motion for summary judgment on Count I will be denied.  The Court notes that a trial will be necessary to determine compensatory damages.

4.      Defendants' Arguments

Although the Court concludes that the school administration lacked authority to punish Justin for his off-campus creation of a Trosch profile, the Court acknowledges that this decision is a close call and Defendants' reaction to the unflattering profile was understandable.  Most

compellingly, Defendants cite to an analogous case from the Pennsylvania Supreme Court.

In *J.S. v. Bethlehem Area School District*, 807 A.2d 847 (Pa. 2002), the Pennsylvania Supreme Court addressed a situation involving a student website, created at home, that contained threatening and derogatory comments about a teacher and principal.[7]  As in this case, the student told other students about the website and showed it to another student at school.  The student remained in school for the remainder of the year without punishment.  In July, the school suspended the student for three days and after a hearing, extended the suspension to ten days - effective at the beginning of the next year.  After an expulsion hearing, the school district voted to expel the student.  However, the parents had already enrolled him in another school.  The Court concluded that the website did not constitute a "true threat."  In the next step of its analysis, the Court found that "there is a sufficient nexus between the web site and the school campus to consider the speech as occurring on-campus."  The Court relied on the facts that the student had accessed the site at school and shown it to another student and that "the web site was aimed not at a random audience, but at the specific audience of students and others connected with this particular School District."  *Id.* at 865.  The Court then held that it would uphold the school's action under the *Fraser* test.  It cautioned that "it is for school districts to determine what is vulgar, lewd or plainly offensive, at least in the first instance" and that "great deference" should be given by the courts to the school official's determination.  *Id.* at 868 n. 13.  Turning to the *Tinker* standard, the *J.S.* Court rejected the parents' argument that the disruption was minimal.  The Court explained that "while there must be more than some mild distraction or curiosity created by the speech, complete chaos is not required."  *Id.* (citation omitted).  The Court also rejected the argument that it was the faculty's reaction, rather than the site itself, that

---

[7]The site contained a page captioned "Why Should [the teacher] Die?" and solicited contributions of $20 to help pay for a hitman.  The site also had a picture in which the teacher's face morphed into that of Adolf Hitler and accused the principal of having sexual relations with an administrator in another building in the district.  Upon seeing the site, the teacher suffered severe anxiety and was unable to finish the school year.

caused the disruption.  Accordingly, the Court held that the School did not violate the First

Amendment rights of the student.[8]  The content of the website, and its impact on school

personnel, was much more extreme in *J.S.* than in this case, although the Court concluded that it

did not rise to the level of a "true threat."[9]  *Id.* at 857-60.  The Court also relied heavily on

testimony that the site had dramatically affected morale in the school.  Nevertheless, the case is

on point and this Court respectfully reaches a slightly different balance between student

expression and school authority.

  Defendants also contend that Justin's speech was not protected by the First Amendment

at all,  for several legal reasons which will be briefly addressed seriatim.  Defendants claim that

Justin's speech constituted "fighting words."  This argument is without merit.  A "MySpace"

internet page is not outside of the protections of the First Amendment under the fighting words

doctrine because there is simply no in-person confrontation in cyberspace such that physical

violence is likely to be instigated.  The case on which Defendant relies, *Gilles v. Davis*, 427 F.3d

197 (3d Cir. 2005) (involving a campus evangelist who insulted a crowd of students), is easily

distinguishable on the facts.  In addition, Defendants claim that Justin's website is "obscene."

While the profile is certainly juvenile and lacks serious value, it does not appeal to a prurient

interest or portray sexual conduct in a patently offensive way so as to rise to the level of

obscenity as defined in *Miller v. California*, 413 U.S. 15, 24 (1973).  Finally, Defendants contend

that the profile constitutes slander per se, in that it imputes to Trosch a criminal offense and

conduct incompatible with his office.  Plaintiffs contend that the profile is a parody and thus

cannot constitute defamation.  The Court does not resolve this dispute because it is irrelevant to

the decision. On one hand, even assuming arguendo that the profile was slanderous, the

---

[8]This case gave the individual defendants a reasonable belief that their punishment of
Justin was lawful.

[9]This Court would have little difficulty concluding that a school district may properly
discipline a student who directs a true threat at the school from a remote location or through the
Internet.

dispositive question here is whether the School District had authority to impose its own punishment on Justin.[10]   The School cannot usurp the judicial system's role in resolving tort actions for alleged slander occurring outside of school.  On the other hand, the School District need not demonstrate that the profile was slanderous if it created a substantial disruption in school operations.

5.      Qualified Immunity

The parties briefed the issue of qualified immunity at the Court's invitation. *See Alexander v. Tangipahoa Parish Sheriff Dept.*, 2006 WL 4017825 *5 (E.D. La. 2006) (majority rule is that courts may raise issue of qualified immunity sua sponte).  Plaintiffs point out, correctly, that the doctrine does not apply to municipal entities such as the school district. Plaintiffs further contend that the Court should deny qualified immunity to the individually-named Defendants because the relevant law is clearly established.

Pursuant to *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Court must make a two-step inquiry.  It must first determine if the facts alleged, taken in the light most favorable to Plaintiffs, show a violation of a constitutional right.  If so, the Court must then consider whether that right was "clearly established."  A right is "clearly established" for purposes of qualified immunity when its contours are sufficiently clear that reasonable officials would know that their actions violated that right.  *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006).  Pre-existing, binding precedent is not required.  *Id.*  The right allegedly violated must be defined at "the appropriate level of specificity."  *Id.*

In *Doe v. Delie*, 257 F.3d 309 (3d Cir. 2001), the Court noted a variety of approaches as to whether district court opinions should be considered in the qualified immunity analysis.  *Id.* at 321 n.10.  In this circuit, unlike several other circuits, district court opinions are entitled to consideration.  However, district court opinions, by themselves, cannot signify that a right has

---

[10]The Court is aware that Trosch has filed a private civil lawsuit in state court.

been "clearly established."  Most circuits do accord weight to opinions of the state's highest court in the qualified immunity analysis.  *Id.*

For the reasons set forth above, the Court concludes that the actions of Ionta and Gill violated Justin's First Amendment rights.  However, the Court concludes that his First Amendment right was not clearly established under the factual circumstances of this case. Plaintiffs' brief does an excellent job of reciting the broad principles that govern student speech. However, all of the Supreme Court's major cases have occurred in on-campus contexts.  The cases from the United States Court of Appeals for the Third Circuit, and the other courts of appeals, have applied this First Amendment jurisprudence, but not in a factually analogous setting.  Indeed, Plaintiffs recognize that "neither the Supreme Court nor the Third Circuit have decided what standard is applicable to out-of-school-student speech."  Plaintiffs' Memorandum of Law on Qualified Immunity at 5.  This Court recognizes the several other district court opinions from this circuit cited above.

In *Morse*, the Justices unanimously agreed that the principal in that case was entitled to qualified immunity.  The majority opinion in *Morse* identified the uncertainty as to the boundaries of school-speech precedents and recognized the necessity for school administrators to react decisively to unexpected events.  The five separate opinions in *Morse* illustrate the plethora of approaches that may be taken in this murky area of law.  Moreover, as explained above, the *J.S. v. Bethlehem* case from the Pennsylvania Supreme Court provided substantial justification for the administrators' actions.  Certainly, the contours of the First Amendment right to make a disparaging profile of a school principal are not "clearly established."  In sum, Ionta and Gill are clearly entitled to qualified immunity in this case.[11]

---

[11]Trosch is entitled to summary judgment because it is undisputed that he was not involved with the disciplinary decision.  *See* Defendants' Statement of Material Facts ¶ 55.

B.      Count II:  Were the Policies of the School District Vague and/or Overbroad?

Although Justin has graduated, the Layshocks have minor children that still attend school

in the district.  Accordingly, they have standing and the Court must address their facial challenge

to the school policies as vague and/or overbroad.  As set forth in their brief, the specific policies

challenged by Plaintiffs state:

> **Student Responsibilities ... Students should express their ideas and opinions
> in a respectful manner.**
>
> **Disciplinary Code ... Respect and decency will prevail at Hickory High
> School.**
>
> **Major Infractions ... (5) verbal abuse ... (12) Insubordination... (21)
> Harassment ... repeated remarks to a person with ... demeaning implications.**
>
> **Abusive Action By Students/Bullying By Students ... (3)
> Disrespect/Harassment – disrespect to teachers, students or other school
> employees will not be tolerated.  Students will be disciplined for being
> disrespectful to school employees or their peers at any time either on or away
> from school property.  Any form of harassment including ...name-calling,
> belittlement, etc. are all considered forms of disrespect/harassment to
> others....**

The School District points out that several other aspects of its Student Agenda Book must also be

considered to provide a full and complete context of the Policies.  In addition, Plaintiffs have

omitted relevant portions of the provisions quoted above:

> **Introduction ... This code of conduct is developed in conjunction with and
> concurring with the Commonwealth of Pennsylvania State Board of
> Education Regulations regarding student rights and responsibilities, the
> Hermitage School District Official School Board Policy, and all local, state
> and federal regulations.**
>
> **Student Rights ... Students have legal rights as persons and citizens.  This
> includes ... the right to express their opinions....**
>
> **Student Responsibilities ... Students share with the school administration and
> staff the responsibility to develop a school climate conducive to learning and
> wholesome living. ...**
>
> **Disciplinary Code.  The disciplinary procedures herein pertain to school
> functions, home or away, school buses, or any other time students are
> representing their school.  Not all acts of misconduct can be itemized,
> however, appropriate and reasonable disciplinary action will be taken for
> offenses not necessarily specified in this section.  Respect and decency will
> prevail at Hickory High School....**

**Abusive Action By Students/Bullying By Students ... Hickory High School students are reminded that taunting, verbally/physically, at athletic and co-curricular events will not be tolerated.  Students are expected to be respectful of their peers and competitors at all athletic and co-curricular activities.**

A policy will be struck down as overbroad if it reaches too much expression that is protected by the Constitution and will inhibit such expression to a substantial extent.  *Sypniewski*, 307 F.3d at 258-59 (describing doctrine as strong medicine of last resort).  A regulation will not be held unconstitutional unless the overbreadth is real and substantial, in relationship to its legitimate reach.  *Saxe*, 240 F.3d at 214.  In *Saxe*, the Court of Appeals explained that courts must consider whether the regulation is susceptible to a reasonable limiting construction before holding it to be unconstitutional.  240 F.3d at 215.  Indeed, every reasonable construction must be resorted to, in order to save a policy from unconstitutionality.  *Id.*  Overbreadth doctrine warrants an even more hesitant application in the school setting.  *Sypniewski*, 307 F.3d at 259.

In *Saxe*, *Killian* and *Flaherty*, the primary basis for finding the school policies at issue to be overbroad was their lack of a "geographical limitation."  In other words, the policies at issue in those cases lacked language to limit the school's authority "to discipline expressions that occur on school premises or at school related activities, thus providing unrestricted power to school officials."  *Flaherty*, 247 F. Supp.2d at 705.

A review of the entire text of the provisions cited by Plaintiffs demonstrates that unlike the policies struck down in *Saxe, Killion* and *Flaherty*, each provision has an appropriate geographic limitation.  The Disciplinary Code section explicitly states that it "pertain[s] to school functions, home or away, school buses, or any other time students are representing their school."  Likewise, the Abusive Conduct by Students provision specifically refers to "athletic and co-curricular events" and the Student Responsibilities provision refers to the "school climate."  The most troubling language in the Student Agenda Book is the reference in the Abusive Conduct by Students provision that students will be disciplined for disrespectful behavior "either on or away from school property."  However, the School District offers a limiting construction – i.e., that "away from school property" refers to "athletic and co-curricular events" held at other schools.

24

Given the context of the provisions as a whole, and the explicit reference in that provision to athletic and co-curricular events, the School's limiting construction is reasonable.  Moreover, the Introduction to the handbook acknowledges students' right to expression and incorporates the limitations imposed by law, including the *Tinker, Fraser* and *Hazelwood* standards.

A policy will be void for vagueness if it fails to give a student adequate warning that his conduct is unlawful or if it fails to set adequate standards of enforcement such that it represents an unrestricted delegation of power to school officials.  *Sypniewski*, 307 F.3d at 258; *Killion*, 136 F. Supp.2d at 459.   Determining the appropriate level of detail for school discipline is left to school officials.  *Id.* at 260.  The Supreme Court further explained that given schools' need to impose discipline for a wide range of unanticipated conduct, "school disciplinary rules need not be as detailed as a criminal code."  *Fraser*, 478 U.S. at 686.  Accordingly, school disciplinary rules will be struck down only "when the vagueness is especially problematic."  *Sypniewski*, 307 F.3d at 266.  The Court finds that the policies at issue provide students with appropriate warning of the type(s) of conduct which are prohibited and set out adequate enforcement standards and parameters for school administrators.

In sum, the Court concludes that the policies themselves are not vague nor overbroad, even though the administration misapplied them in this case.  Accordingly, summary judgment will be granted to Defendants on Count II.

C.      Count III:  Claims Asserted by the Parents

Justin's parents allege that the School District's conduct violated their own parental right to discipline their child.  This claim is without merit.  It is well-established that schools act in loco parentis and have the authority to impose discipline on students.  *See, e.g., J.S. v. Bethlehem*, 807 A.2d at 860.  Mr. and Mrs. Layshock explained in their depositions that this claim was brought because the parents "didn't feel that the school had a right to punish [Justin] for

something that wasn't done at school." This, of course, is the gravamen of Count I. When pressed, the parents were unable to articulate how the school's action interfered with their parental discipline of Justin. In fact, Mr. Layshock testified that the parents ***did*** discipline Justin by grounding him. In *C.N. v. Ridgewood Board of Education*, 430 F.3d 159, 184 (3d Cir. 2005), the Court of Appeals explained that a constitutional violation occurs only where the school's action deprives parents of their right to make a decision concerning their child, not where the school's conduct complicates the parental decision-making and implementation. Thus, it is clear that the parents have no valid independent right of recovery which is not merely duplicative of Justin's First Amendment claim. Defendants are entitled to summary judgment on Count III.

Conclusion

The parties' cross-motions for summary judgment will be granted in part and denied in part. The Court concludes that Plaintiff Justin Layshock is entitled to summary judgment on his First Amendment claim in Count I against Hermitage School District. Trosch is entitled to summary judgment on all counts, as he was not involved in the discipline. Ionta and Gill are entitled to summary judgment on Count I on the basis of qualified immunity. All Defendants are entitled to summary judgment as to the vagueness/overbreadth challenge to the policies of the school district and the claims of the parents in Counts II and III.

An appropriate order follows.

McVerry, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JUSTIN LAYSHOCK, a minor, by and )
through his parents, DONALD )
LAYSHOCK and CHERYL LAYSHOCK, )
individually and on behalf of their son, )
                                        )
            Plaintiffs, )
                                        )
    v.                                  )
                                        )          2:06-cv-116
HERMITAGE SCHOOL DISTRICT, )
KAREN IONTA, District Superintendent, )
ERIC W. TROSCH, principal of Hickory )
High School, CHRIS GILL, Co-Principal of )
Hickory High School, all in their official )
and individual capacities, )
                                        )
            Defendants. )

## ORDER OF COURT

AND NOW, this 10th day of July, 2007, in accordance with the foregoing Memorandum

Opinion it is hereby ORDERED, ADJUDGED and DECREED that PLAINTIFFS' MOTION

FOR SUMMARY JUDGMENT (*Document No. 44)* is **GRANTED IN PART AND DENIED**

**IN PART** and DEFENDANTS' MOTION FOR SUMMARY JUDGMENT *(Document No. 49*)

is **GRANTED IN PART AND DENIED IN PART**.  Justin Layshock is entitled to summary

judgment against Hermitage School District as to liability on Count I of Plaintiffs' complaint.

Defendants Trosch, Ionta and Gill are entitled to summary judgment on all counts and they are

dismissed as parties in this case.  Defendant Hermitage School District is also entitled to

summary judgment on Counts II and III.   In all other respects, the motions are denied.

A jury trial will be necessary to determine compensatory damages on Count I. Accordingly, the remaining Plaintiff, Justin Layshock, through his parents, shall file a pretrial statement on or before July 30, 2007.   The remaining Defendant, Hermitage School District, shall file a pretrial statement on or before August 20, 2007.  A pretrial conference shall be held in Courtroom 6C before the undersigned on September 6, 2007 at 9:30 a.m.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge


cc:    Witold J. Walczak, Esquire
Email: vwalczak@aclupgh.org

Kim M. Watterson
Email: kwatterson@reedsmith.com

Anthony G. Sanchez
Email: asanchez@andrewsandprice.com

Beth S. Mills
Email: bmills@andrewsandprice.com